**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| RAVEN HILL PARTNERS, INC. | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) File No.: 5:12-CV-411 |
| | ) |
| BASF CORPORATION, | ) |
| a New Jersey corporation; | ) **JURY TRIAL DEMANDED** |
| BASF CATALYSTS, LLC, | ) |
| a Maryland corporation; | ) |
| BASF SCHWEIZ, AG, | ) |
| a Swiss corporation; | ) |
| BASF SE, | ) |
| a European company; | ) |
| BASF NEDERLAND B.V., | ) |
| a Dutch corporation; and | ) |
| ROBERT W. BAIRD & CO., | ) |
| a Wisconsin corporation, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR BREACH OF CONTRACT, MISREPRESENTATION, BAD FAITH NEGOTIATION, AND FRAUD

COMES NOW Plaintiff Raven Hill Partners, Inc. ("Raven Hill") and states

the following as its Complaint:

### NATURE OF THE CASE

**1.** Between 2010 and 2012, Plaintiff Raven Hill took part in negotiations

with Defendants, for the purchase of assets and shares owned by BASF

Corporation—specifically those assets that comprised BASF's kaolin clay processing operations in this Judicial District (referred to herein as the "Palau Operations" and/or the "Palau Assets").

2.      To induce Raven Hill's continued interest in the Palau Operations, BASF agreed to reimburse Raven Hill's due diligence and other expenses associated with the transaction; however, BASF breached that contract and has refused, to date, to reimburse any of Raven Hill's expenses.

3.      Defendants concealed material information, denied requests for access to senior management and facilities, and made material misrepresentations to Raven Hill, in a successful effort to misrepresent the true value of the Palau Operations and thus induce Raven Hill to incur substantial costs exploring and negotiating the transaction with Defendants.

## **PARTIES**

4.      Plaintiff Raven Hill Partners, Inc. is a private investment and merchant-banking corporation based in Toronto, Ontario.

5.      Defendant BASF Corporation, a Delaware corporation, is a division of BASF Group, a chemical company; it is the North American affiliate of and is wholly owned by BASF SE.  BASF Corporation is headquartered in Florham Park, New Jersey.

6.     BASF Catalysts, LLC, is, on information and belief, a subsidiary of BASF Group, a chemical company.  On information and belief, BASF Catalysts, LLC is wholly owned by BASF SE.  BASF Catalysts, LLC is headquartered in Iselin, New Jersey.  Plaintiff is informed and believes BASF Catalysts, LLC is a Maryland limited liability company.

7.     BASF Schweiz, AG is, on information and belief, a subsidiary of BASF Group; it is a Swiss corporation, headquartered in Basel, Switzerland.

8.     BASF SE is, on information and belief, the largest operating company of BASF Group and holds the shares in all the companies belonging to the BASF Group.  BASF SE is a European company (SE) and is headquartered in Ludwigshafen, Germany.

9.     BASF Nederland B.V. is a division of BASF Group; it is wholly owned by BASF SE.  BASF Nederland B.V. is a Dutch company, headquartered in the Netherlands.

10.    Defendants BASF Corporation, BASF Catalysts, LLC, BASF Schweiz AG, BASF SE, and BASF Nederland B.V. will be referred to collectively herein as "BASF."

11.    Defendant Robert W. Baird & Co. ("Baird") is an asset management and private equity firm headquartered in Milwaukee, Wisconsin.  At all times relevant to this case, Baird acted as an agent of BASF.

## JURISDICTION AND VENUE

**12.** This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 (diversity of citizenship jurisdiction). Raven Hill is a foreign corporation and a citizen of Canada. Plaintiff is informed and believes BASF Catalysts, LLC is a citizen of Maryland, where it is incorporated. BASF Corporation is a citizen of the states of Delaware, where it is incorporated, and New Jersey, where it maintains its principal place of business and its headquarters. BASF SE is a citizen of Europe; BASF Nederland B.V. is a citizen of the Netherlands; and BASF Schweiz AG is a citizen of Switzerland. Baird is a citizen of the state of Wisconsin, where it maintains its principal place of business and its headquarters. The parties are completely diverse, and the amount in controversy exceeds $75,000.00.

**13.** Venue in this District is proper under 28 U.S.C. § 1391(b)(2), because the Palau Operations, the subject matter of the negotiations and statements at issue, are located in this judicial district. A substantial portion of the events giving rise to this action, therefore, took place in this judicial district. Furthermore, venue is proper in this Division under Local Rule 3.4, because the claim arose in this Division.

## FACTUAL BACKGROUND

**14.** BASF Group is an international chemical company headquartered in Europe with several multinational divisions and subsidiaries.

**15.**     BASF Catalysts LLC and BASF Corporation are United States subsidiaries of BASF Group, operating, *inter alia*, kaolin clay processing facilities in this judicial district.[1]

**16.**     On or about September 24, 2010, Raven Hill entered into a confidentiality agreement with BASF (through its agent, Baird) concerning the possible purchase of BASF's kaolin clay processing operations (the "Palau Operations").

**17.**     As part of the negotiations for the purchase of the Palau Operations, in or about September 2010, Defendants provided Raven Hill with a Confidential Information Memorandum ("CIM") detailing the assets/processes and fiscal condition of the Palau Operations.

**18.**     The CIM stated, *inter alia*, the following:

a.     "[M]anagement is projecting capital expenditures to increase from 2010E levels to average $9.1 million from 2010P – 2013P." *See* **Exhibit 1**, Confidential Information Memorandum, p. 66 (a chart on that page shows projected capital expenditures of $9.0 million in 2011 and 2012 and $9.5 million in 2013).

---

[1] Kaolin clay is most often used to improve the quality of commercial paper products (such as by making them glossy) but is also used in various other non-paper industrial products (such as paints, plastics, inks, and rubbers).

b.   "[Expenditures needed to modernize waste material retention ponds] increased Palau's capital investments by $4.3 million and $0.8 million during 2008 and 2009, respectively; however, **investment in these assets is now complete.**"   *Id.* at 62. (**Emphasis** added).

**19.**   The CIM also outlined several future growth opportunities that would be divested in the sale of the Palau Operations.  *See, e.g.*, *id.* at 13, 35.

**20.**   On or about October 8, 2010, based on the information provided by Defendants, Raven Hill submitted an initial bid for the purchase of the Palau Operations.

**21.**   On or about November 17, 2010, in Detroit, Michigan, Defendants met with Raven Hill representatives; during that meeting, which was attended by Jürgen Herzog, Doug Martin, and K. Dino Karanikas, all members of senior management at BASF, BASF mentioned its water barrier technology and indicated that it would be included in the eventual divesture.[2]

**22.**   During the above communications, BASF represented that it would only retain (or retain the ability to license back) technology related to BASF's catalyst business.

---

[2] The water barrier technology represented an extremely exciting opportunity for future growth as it was expected to potentially replace current technology used to seal paper products (such as, paper cups).  There were, accordingly, significant business opportunities associated with the technology.

23.    Raven Hill incurred substantial costs in the diligence process.  In early 2011, Raven Hill discussed these costs with Defendants, and Defendants agreed that BASF would reimburse Defendant for its reasonable costs, up to $1,250,000.00, if the transaction was not completed because of BASF's abandonment thereof, or as a result of Defendants providing incorrect information to Raven Hill.

24.    One consideration in the March 15, 2011 Expense Reimbursement Letter that would affect the level of reimbursement was the proposed purchase price amount.  Raven Hill agreed that this proposed purchase price would be $222.7 million.  That agreement was founded, in substantial part, on Raven Hill's reasonably placed understanding that it would be purchasing, among other assets, the water barrier technology and related business that had been discussed in detail as part of this transaction and the lack of capital expenditures needed for impound ponds.

25.    This March 15, 2011 Expense Reimbursement Letter (the "March 15, 2011 Agreement") was supported by good and valuable consideration and was a binding contract between the parties.  *See* **Exhibit 2**, March 15, 2011 Expense Reimbursement Letter between Raven Hill and BASF.

26.    However, under the March 15, 2011 Agreement, BASF would not be obligated to reimburse any expenses in the event  Raven Hill "determine[d] not to

proceed with the proposed Transaction at the Proposed Purchase Price for a reason other than Incorrect Information . . . ." *See id.*

27.    In reliance on the March 15, 2011 Agreement, Raven Hill continued to conduct due diligence and negotiations with BASF, and, as a result, incurred substantial costs and expenses.

28.    On or about April 7, 2011, in Florham Park, New Jersey, Defendants met with Raven Hill representatives.  During that meeting Anthony Lake, a BASF representative, made a presentation regarding BASF's water barrier technology and represented that Raven Hill would receive exclusive ownership and use of the water barrier technology and related business as part of the divesture.  Jürgen Herzog, Doug Martin, and K. Dino Karanikas, all members of senior management at BASF, attended this meeting and did not dispute Lake's representations.

29.    The asset purchase agreement being negotiated also indicated that the water barrier technology would be included in the divesture.

30.    In or about April 2011, an arc flash explosion occurred at one of BASF's kaolin clay operations facilities.  Defendants did not disclose this material event to Raven Hill until on or about October 5, 2011[3].

---

[3] Plaintiff is informed and believes that the arc flash explosion may have been initiated by factors that threatened to cause future explosions.  Although the explosion occurred at a non-Palau Operations facility, the same dangerous conditions existed in Palau Operations facilities—creating a significant safety liability in Palau Operations facilities and requiring significant capital expenditures to update Palau Operations facilities and prevent future explosions.

**31.** During and after April 2011, Raven Hill made several requests to speak with Palau Operations management personnel to discuss the state of the operations related to, *inter alia,* the status/condition of the facilities (including, but not limited to the impound ponds), the potential for future explosions, and the safety of the operating facilities.

**32.** Defendants consistently denied these reasonable requests and obstructed Raven Hill's access to both Palau Operations management and important due diligence information.  In one instance, Defendants represented that a Raven Hill representative could visit the Palau Operations facilities but then abruptly withdrew the invitation on the day before the planned visit and after Raven Hill's representative was already en route.

**33.** In or about April 20, 2011 Defendants had a conference call with Raven Hill representatives.  During that call, in which Anthony Lake, Jürgen Herzog, Jan Jeffries, and K. Dino Karanikas participated, BASF represented that Raven Hill would receive exclusive ownership and use of the water barrier technology and related business as part of the divesture.

**34.** Throughout the next several months, Raven Hill's due diligence uncovered several disturbing realizations, suggesting that Defendants had made a number of material misrepresentations about the state of the Palau Operations.

35.     Defendants' misrepresentations, which materially affected the value of the Palau Operations and any negotiated divesture, included, *inter alia*, the following:

    a.     A significant portion of the capital expenditures—$4 million—budgeted for 2011 had been deferred to 2012, thus requiring Raven Hill to make greater expenditures post-acquisition, *see* **Exhibit 3**, November 13, 2011 letter from Raven Hill to BASF;

    b.     Palau's impound ponds, which Defendants repeatedly indicated would not require further expenditures, in fact required $24 million in previously undisclosed capital expenditures and presented significant environmental concerns, *see id.*;

    c.     BASF's water barrier technology and related business, which were always intended to travel with the deal, would not be exclusively Raven Hill's to own and use—rather, BASF demanded that Raven Hill license the technology back to BASF free of royalty such that it could compete with Raven Hill in pursuit of business opportunities related to the technology[4];

    d.     The arc flash explosion—which caused at least $8 million in damage, put human life at risk, made significant future capital

---

[4] Raven Hill first learned of this change, which substantially changed the economic value of the proposed transaction, on or about October 5, 2011 at a meeting with Dr. Uwe Liebelt (BASF) in Jersey City, New Jersey.

expenditures likely, and made additional due diligence necessary at several other, similarly at-risk facilities—had not been timely disclosed by BASF; and

e. Defendants' consistent denial of access to Palau Operations personnel and facilities prevented Raven Hill from evaluating the true value of the Palau Operations, the loss in value represented by the above misrepresentations, and/or the damages, costs, and safety risks represented by the possibility of future arc flash explosions.

36. BASF also attempted to renege on several other previously agreed-upon terms of the transaction, such as the ceiling/floor multiples related to the purchase price.

37. On or about September 6, 2011, BASF unilaterally abandoned the binding asset purchase agreement negotiations, which were virtually complete, and demanded that the parties switch to a non-binding letter of intent process, for reasons that offered no benefit to Raven Hill and could potentially create substantial difficulties for Raven Hill, including, *inter alia*, in terms of securing financing.

38. Troubled by, *inter alia*, Raven Hill's discovery of BASF's mounting misrepresentations; BASF's refusal to grant Raven Hill's access to the senior

management and physical facilities at issue; and BASF's abandonment of the purchase agreement process, on or about November 13, 2011, Raven Hill proposed new terms for the purchase of the Palau Operations, altering the structure of the transaction to reflect the new information obtained during due diligence. *See* **Exhibit 3**, November 13, 2011 letter from Raven Hill to BASF.[5]

39.     On or about November 23, 2011, BASF, made a counterproposal that claimed to be a "final" offer.  That "final offer" was nothing more than a sharply negotiated counterproposal—a fact made clear by BASF's invitation in that same communication to continue negotiations on a number of open issues.[6] *See* **Exhibit 4**, November 23, 2011 letter from BASF to Raven Hill, p. 2.

40.     Raven Hill ultimately accepted the price proposed in BASF's November 23, 2011 letter, but sought concessions on several noneconomic structural issues.

41.     On or about December 5, 2011, BASF informed Raven Hill that its request for different terms constituted a rejection of BASF's "final" offer and further stated that BASF considered this an election (by Raven Hill) not to proceed with the transaction.

---

[5] Up to this point, Raven Hill had structured its proposal to allow BASF to receive the entire $222.7 million price outlined in the March 15, 2011 Agreement if the Palau Operations achieved certain performance benchmarks. However, at BASF's request, Raven Hill offered a flat price in this proposal, which, accordingly, caused the price to fall below the $222.7 million mark because of concerns over BASF's misrepresentations.

[6] This "final" offer was, essentially, an attempt to fabricate Raven Hill's abandonment of the deal in bad faith; it required Raven Hill to obtain financing commitments on very short notice and without banks having seen final terms, making acceptance of the offer effectively impossible.

**42.**    On or about December 19, 2011, BASF reiterated this position and stated that it saw no possibility of changing that position or reopening negotiations.

**43.**    In spite of its public position that negotiations had ended, Defendants continued negotiations with Raven Hill between December 2011 and February 2012.

**44.**    In or about February 2012, pursuant to those negotiations, Raven Hill provided BASF with a complete financing package, which demonstrated Raven Hill's ability to honor all financial commitments and totaled in excess of the amount required to close the deal.

**45.**    In or about February 2012, Uwe Liebelt represented to Raven Hill that BASF would consider Raven Hill's proposal to consummate the transaction.

**46.**    On or about February 17, 2012, BASF permanently abandoned negotiations with Raven Hill.

**47.**    On or about February 23, 2012, BASF having abandoned the transaction, Raven Hill submitted its request for reimbursement with all necessary accompanying documentation.

**48.**    On or about March 16, 2012, BASF rejected Raven Hill's request for reimbursement, falsely asserting that Raven Hill had abandoned the transaction and thus was not entitled to reimbursement.

**49.** As a result of and in reliance on Defendants' material misrepresentations, *see supra* ¶¶ 31-32, Raven Hill incurred significant out-of-pocket expenses, as well as significant opportunity costs and lost profits. *See, e.g.*, **Exhibit 5**, February 23, 2012 letter from Raven Hill to BASF requesting reimbursement (providing documentation for $1,808,991.97 in expenses).

## COUNT I — BREACH OF CONTRACT
### (Defendant BASF Only)

**50.** The allegations of all preceding paragraphs are fully incorporated herein.

**51.** The March 15, 2011 Agreement is a contract, enforceable under the laws of New Jersey and Georgia.

**52.** Defendant breached the March 15, 2011 Agreement when it improperly refused to reimburse Plaintiff's expenses.

**53.** Plaintiff has suffered losses of no less than $1,250,000 as a result of Defendant's breach.

## COUNT II—BAD FAITH IN PERFORMANCE & NEGOTIATION
### OF CONTRACT

**54.** The allegations of all preceding paragraphs are fully incorporated herein.

**55.**     New Jersey law[7] imposes on the parties to a contract an obligation of good faith in the performance and enforcement of the contract.  *See* NJ Rev. Stat. § 12A:1-203.

**56.**     Defendants violated their obligation of good faith by breaching the reimbursement contract in bad faith and by negotiating in bad faith.

**57.**     Defendants attempted to evade the spirit of the bargain and willfully rendered imperfect performance when they provided Plaintiff with a "final" offer, that, by its own terms, encouraged Plaintiff to offer additional and/or different terms.

**58.**     Defendants attempted to fabricate an abandonment of the transaction by Raven Hill so that it could avoid its contractual obligation to reimburse Raven Hill's reasonable expenses.

**59.**     Defendants acted deceitfully by consistently conveying to Plaintiff their intention to reimburse Plaintiff's expenses, while knowing that they in fact had no such intention.

**60.**     Defendants acted deceitfully by concealing the arc flash explosion from Raven Hill and by consistently denying Raven Hill access to the Palau Operations facilities and personnel.

---

[7] The March 15, 2011 Agreement is governed by New Jersey law by its terms.

61.     Defendants acted in bad faith when they negotiated the March 15, 2011 Agreement, which tied reimbursement to purchase price, while knowing that they misrepresented the value of the assets to the purchased and that they intended to remove certain assets from the transaction.

62.     These willful acts amount to bad faith and an overt attempt to evade performance of the March 15, 2011 Agreement.

63.     Plaintiff is informed and believes that Defendants negotiated in bad faith by fraudulently convincing Plaintiff to continue negotiating so that Defendants could use Plaintiff's interest in the Palau Operations to leverage a better offer from other bidders.

64.     Defendants' bad faith directly and proximately caused Plaintiff injury, in the form of the substantial costs and expenses incurred during due diligence and negotiations, as well as lost opportunity costs.

## COUNT III — FRAUD
### (With Regards To The Purchase Of BASF's Assets)

65.     The allegations of all preceding paragraphs are fully incorporated herein.

66.     Throughout the course of negotiations, Defendants provided Plaintiff with inaccurate and incomplete information, delayed disclosures, hid information,

restricted access to management personnel, reneged on terms already agreed upon, and otherwise misled Raven Hill.  *See, e.g.*, *supra*, ¶¶ 31-32.

67.     Defendants' made specific, material representations which included, but were not limited to, (1) that management intended to make $9.0 million in capital expenditures during 2011; (2) that the impound ponds required no further capital expenditures; (3) that Plaintiff would have exclusive use and ownership over the water barrier technology and related business; and (4) that Palau Operations facilities were safe.  *See id.*

68.     Each of those misrepresentations concerned a fact or circumstance then existing or in the past, and each of those misrepresentations were untrue—(1) management put approximately $4 million in capital expenditures off until after the sale of the Palau Operations and never intended to make the full $9 million expenditure in 2011; (2) the impound ponds required at least $24 million in capital expenditures; (3) the water barrier technology and related business would have to be licensed to BASF, substantially reducing the value of the transaction; and (4) the undisclosed arc flash explosion would require millions of dollars in expenditures to repair and prevent.

69.     Defendants   knew   of   or   believed   in   the   falsity   of   these misrepresentations when they were made to Plaintiff.

70.     Defendants intended for Plaintiff to rely on these misrepresentations in the course of pricing and negotiating its deal with Defendants.

71.     Plaintiff reasonably relied on Defendants' misrepresentations by continuing to explore the purchase of the Palau Operations and by continuing to incur due diligence and other expenses.

72.     Had Defendants not misrepresented the financial state of the Palau Operations, Plaintiff could have more accurately gauged its interest in the transaction and acted accordingly.

73.     As a result of Defendants' misrepresentations, Plaintiff incurred out-of-pocket expenses, lost profits, and opportunity costs.

## COUNT IV— FRAUD
### (With Regards To The Reimbursement Contract)

74.     The allegations of all preceding paragraphs are fully incorporated herein.

75.     Throughout the course of negotiations, Defendants provided Plaintiff with inaccurate and incomplete information, delayed disclosures, hid information, restricted access to management personnel, reneged on terms already agreed upon, and otherwise misled Raven Hill.  *See, e.g.*, *supra*, ¶¶ 31-32.

76.     Defendants made specific, material representations which included, but were not limited to, (1) that management intended to make $9.0 million in

capital expenditures during 2011; (2) that the impound ponds required no further capital expenditures; (3) that Plaintiff would have exclusive use and ownership over the water barrier technology and related business; and (4) that Palau Operations facilities were safe. *See id.*

77.     Each of those misrepresentations concerned a fact or circumstance then existing or in the past, and each of those misrepresentations were untrue—(1) management put approximately $4 million in capital expenditures off until after the sale of the Palau Operations and never intended to make the full $9 million expenditure in 2011; (2) the impound ponds required at least $24 million in capital expenditures; (3) the water barrier technology and related business would have to be licensed to BASF, substantially reducing the value of the transaction; and (4) the undisclosed arc flash explosion would require millions of dollars in expenditures to repair and prevent.

78.     Defendants knew of or believed in the falsity of these misrepresentations when they were made to Plaintiff; Defendants knew that when they removed assets from the proposed transaction and revealed the true value of the Palau Operations, Plaintiff would be forced to choose between making a unreasonable bid for the Palau Operations and being fully reimbursed.

79.     Defendants intended for Plaintiff to rely on these misrepresentations when agreeing to the March 15, 2011 Expense Reimbursement Letter that was tied to purchase price.

80.     Plaintiff reasonably relied on Defendants' misrepresentations by signing the March 15, 2011 Expense Reimbursement Letter, which tied the Palau Operations' purchase price to the fraudulently calculated reimbursement cap.

81.     As a result of Defendants' misrepresentations, Plaintiff incurred out-of-pocket expenses, lost profits, and opportunity costs.

## PUNITIVE DAMAGES

82.     The allegations of all preceding paragraphs are fully incorporated herein.

83.     Defendants' fraudulent conduct was intentional, willful, and wanton and evidenced a disregard for the rights of Plaintiff; it further evidenced a willingness to conduct business in a way that is injurious both to Plaintiff and to the public's interest in and opinion of businesses.

84.     This malicious conduct warrants exemplary or punitive damages to prevent similar future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

**1.**     Compensatory damages—for, *inter alia*, out-of-pocket expenses, opportunity costs, and lost profits—against BASF and Baird in an amount to be determined at trial, but in no event less than $1,808,991.97, plus pre-judgment and post-judgment interest;

**2.**     Punitive damages in an amount to be awarded at trial, such amount sufficient to deter such fraudulent behavior in the future;

**3.**     Costs, expenses, and attorney's fees incurred by Plaintiff in this case; and

**4.**     Such other and further relief as the court deems just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on any and all issues so triable.


This 16th day of October 2012.

Respectfully submitted,

**CLARK & SMITH LAW FIRM, LLC**
BY:


/s/ John Christopher Clark
John Christopher Clark
Georgia Bar No.: 127353

3402 Vineville Avenue, Suite A
Macon, Georgia 31204
Phone:  (478) 254-5040
Fax:     (478) 254-5041
Email:  chris@clarksmithlaw.com

**WARD & WARD**
BY:

/s/ Daniel S. Ward
Daniel S. Ward

2020 N Street, N.W.
Washington, D.C. 20036
Phone:   (202) 331-8160
Fax:       (202) 503-1455
Email:    dan@wardlawdc.com

*Counsel for Plaintiff Raven Hill Partners, Inc.*