**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **RAVEN HILL PARTNERS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:12-CV-411(MTT)** |
| ) | |
| **BASF CORPORATION, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## ORDER

This matter is before the Court on Defendant BASF SE's motion to dismiss for lack of personal jurisdiction and failure to state a claim, or in the alternative, for a more definite statement of Plaintiff Raven Hill Partners, Inc.'s second amended complaint. (Doc. 67).

### I.   FACTUAL AND PROCEDURAL BACKGROUND

#### A.   Allegations from Raven Hill's Second Amended Complaint

Between 2010 and 2012, Raven Hill alleges it negotiated with Defendants BASF Corporation, BASF Catalysts, LLC, and BASF SE,[1] through their agent Defendant Robert W. Baird & Co., Inc., regarding the possible purchase of BASF's kaolin clay processing operations, known as the "Palau Operations."  (Doc. 38 at ¶¶ 1, 10).  On September 24, 2010, Raven Hill entered into a confidentiality agreement regarding the potential acquisition.  (Doc. 38 at ¶ 15).  During negotiations, the Defendants provided Raven Hill with a Confidential Information Memorandum ("CIM") detailing the Palau

---

[1] These entities are sometimes collectively referred to in this Order as BASF.

Operations' fiscal condition and several growth opportunities that would be divested in its sale.  (Doc. 38 at ¶¶ 16, 18).

On October 8, 2010, Raven Hill submitted an initial bid for the Palau Operations based on the information provided by the Defendants.  (Doc. 38 at ¶ 19).  On November 17, Raven Hill representatives met with members of BASF senior management, including BASF SE employee Jürgen Herzog and BASF Corporation employees Doug Martin and Dino Karanikas, in Detroit, Michigan.  (Doc. 38 at ¶ 20).  At the meeting, BASF "indicated" that its water barrier technology[2] would be included in the sale and that BASF would retain, or have the ability to license back, technology related to its catalyst business.  (Doc. 38 at ¶¶ 20-21).

On March 15, 2011, Raven Hill and BASF executed an Expense Reimbursement Letter because of the substantial due diligence costs being incurred by Raven Hill. (Doc. 38 at ¶¶ 22-23).  The letter provided that the Defendants would reimburse Raven Hill for its reasonable costs, up to $1,250,000, if the transaction was not completed because BASF either abandoned it or provided incorrect information to Raven Hill. (Doc. 38 at ¶ 22).  To be reimbursed for the full amount of due diligence expenses, the Expense Reimbursement Letter required Raven Hill to agree to a purchase price of $222.7 million.  (Doc. 38 at ¶ 23).  Raven Hill continued to conduct due diligence in reliance on the letter.

On April 7, 2011, representatives of Raven Hill attended a meeting with Anthony Lake, a BASF representative, in Florham Park, New Jersey.  (Doc. 38 at ¶ 27).  At that meeting, Lake made a presentation regarding BASF's water barrier technology and represented that Raven Hill would receive exclusive ownership and use of the

---

[2] There were significant business opportunities associated with this technology because it had the potential to replace current technology used to seal paper products.  (Doc. 38 at ¶ 20 n.4).

technology and related business as part of the sale of the Palau Operations.  (Doc. 38 at ¶ 27).  Herzog, Martin, and Karanikas also attended the meeting and did not dispute Lake's representations.  (Doc. 38 at ¶ 27).  On April 20, Raven Hill participated in a conference call with BASF representatives, including Lake, Herzog, and Karanikas, in which the BASF representatives confirmed Raven Hill would receive exclusive ownership and use of the water barrier technology.  (Doc. 38 at ¶ 32).

In April 2011, an arc flash explosion occurred at another BASF-owned kaolin facility, implicating the possibility of explosions at the Palau Operations.[3]  (Doc. 38 at ¶ 29).  Raven Hill alleges that it made multiple attempts to discuss the condition and safety of the Palau Operations with local management during and after April 2011, but these efforts were thwarted by BASF personnel, including Herzog.  (Doc. 38 at ¶¶ 30-31).  Raven Hill alleges that its "due diligence uncovered several disturbing realizations" and suggested the Defendants had made multiple material misrepresentations during the course of negotiations.  (Doc. 38 at ¶ 33).

Based on these discoveries and a change in the negotiating process,[4] Raven Hill proposed new terms for the purchase on November 13, 2011.  (Doc. 38 at ¶ 37).  On November 23, BASF made a counterproposal that it claimed was a final offer.  (Doc. 38 at ¶ 38).  Raven Hill alleges that BASF's final offer was essentially "an attempt to fabricate Raven Hill's abandonment of the deal in bad faith" because it imposed financing commitments on such short notice that it was "effectively impossible" to accept the offer.  (Doc. 38 at ¶ 38 n.8).  Raven Hill nevertheless accepted the proposed price

---

[3] On October 5, 2011, the Defendants finally disclosed the arc flash explosion to Raven Hill.  (Doc. 38 at ¶ 29).

[4] Raven Hill alleges that BASF unilaterally abandoned the binding asset purchase agreement negotiations on September 6, 2011 and demanded that the Parties switch to a nonbinding letter of intent process. (Doc. 38 at ¶ 36).

but requested concessions on several other issues.  On December 5, BASF informed Raven Hill that its request for different terms constituted a rejection of BASF's offer and an election by Raven Hill not to proceed with the transaction.  (Doc. 38 at ¶ 40).

Despite Raven Hill's "rejection" of BASF's "final offer," BASF continued negotiations with Raven Hill until February 17, 2012, when it permanently abandoned the transaction.  (Doc. 38 at ¶¶ 42, 45).  On February 23, Raven Hill submitted its request for reimbursement pursuant to the Expense Reimbursement Letter.  (Doc. 38 at ¶ 46).  However, BASF rejected Raven Hill's request, asserting that Raven Hill had abandoned the transaction and was, therefore, not entitled to reimbursement.  (Doc. 38 at ¶ 47).

### B.    Facts Regarding BASF SE

Raven Hill named BASF SE as a defendant in its original complaint.  (Doc. 1). Raven Hill asserts that it then dropped BASF SE from its first amended complaint based on statements by the Defendants' counsel that BASF SE was not a necessary party, but Raven Hill reserved the right to join it in the future if joinder became appropriate.  (Doc. 4 at 1 n.1).  Raven Hill subsequently experienced difficulty obtaining discovery from BASF SE because the Defendants' counsel asserted they did not represent that entity. Because of these difficulties, Raven Hill amended its complaint to rejoin BASF SE as a defendant.[5]  BASF SE has now moved to dismiss, claiming this Court lacks personal jurisdiction and that Raven Hill's second amended complaint fails to state a claim.

BASF SE is a publicly-traded European company organized and existing under European law with its principal office and largest manufacturing plant located in

---

[5] Raven Hill also experienced the same difficulties with BASF Nederland BV.  The Court previously dismissed BASF Nederland as a party to this action but noted further developments could warrant rejoinder.  (Doc. 71).

Ludwigshafen, Germany.  (Doc. 67-2 at ¶¶ 6-7).  BASF SE engages in the business of manufacturing and selling chemicals and chemical products.  (Doc. 67-2 at ¶ 8).  In the ordinary course of business, BASF Corporation sells products in the United States that are manufactured by BASF SE in Germany.  (Doc. 67-2 at ¶ 21).  However, BASF SE made direct sales to two Georgia customers from 2011 to 2013, which represented less than .001 percent of BASF SE's total sales with third parties during that time period.[6] (Doc. 67-2 at ¶ 21).  The Defendants contend these sales are not related to Raven Hill's claims.

Herzog, director of BASF SE's mergers and acquisitions, assisted the other BASF Defendants with the Palau negotiations.  (Doc. 67-2 at ¶ 25).  Although Herzog's assistance resulted in multiple interactions with Raven Hill employees, none of Herzog's interactions took place in Georgia.  (Doc. 67-2 at ¶¶ 25-26).

Raven Hill alleges that BASF SE was the "original architect" of the Palau Operations.  (Doc. 75 at 7).  In June 2006, BASF SE acquired Engelhard Corporation, which was renamed as BASF Catalysts LLC.  (Doc. 75-9 at 2).  Through this acquisition, BASF SE became the owner of an industrial kaolin business, including the mining and processing operations located in Middle Georgia.[7]  (Doc. 74-4 at 1).  Herzog

---

[6] Based on Herzog's testimony about these sales in his initial affidavit, Raven Hill assumed BASF SE's Georgia sales were substantial because BASF SE boasted over 210 billion euros of sales in 2012 and 2013, which would have equated to millions of dollars in sales to the identified Georgia entities.  However, Herzog subsequently clarified the quantity of sales in his reply declaration.  He testified that BASF SE's sales from 2011 to 2013 to the two Georgia customers equates to $169,740 at today's conversion rates. (Doc. 78-2 at ¶ 28).

[7] The Defendants maintain that BASF SE never had direct ownership of the operations and facilities in Middle Georgia because Iron Acquisition Corporation ("IAC"), a Delaware corporation and wholly-owned subsidiary of BASF SE's predecessor, BASF Aktiengesellschaft, acquired substantially all of Engelhard's outstanding shares through a tender offer.  (Doc. 78-1 at ¶¶ 3-4).  Pursuant to the plan of merger, IAC merged into Engelhard, and as the surviving entity, Engelhard continued to own the Middle Georgia operations.  (Doc. 78-1 at ¶ 4).  Subsequently, Engelhard was converted to a limited liability company and renamed as BASF Catalysts LLC.  (Doc. 78-1 at ¶ 4).  On April 1, 2010, as a result of an internal

was appointed to the negotiation team to lead the sale of the kaolin business, including

the Palau Operations.  (Doc. 74-4 at 23).  Further, Raven Hill produced a confidentiality

agreement with a potential purchaser of the kaolin business that was executed by BASF

SE.[8]  (Doc. 75-18).  Raven Hill alleges that BASF SE has substantial and ongoing

contacts with Georgia by exporting goods from the state.  In January 2009, BASF SE

entered into several contracts to ship clay from Savannah, Georgia to Europe and the

Mediterranean.[9]  (Docs. 75-10; 75-12).

Raven Hill alleges that BASF SE and Herzog exercised substantial control during

the course of the Palau negotiations.  For example, BASF SE required multiple BASF

Corporation and BASF Catalyst employees, including some employees located in

Georgia, to sign "declarations of secrecy" regarding their participation in the Palau

negotiations.[10]  (Docs. 75-1; 75-2).  These declarations of secrecy state, "Including

additional team members shall be made only in exceptional cases and you shall inform

---

corporate reorganization, BASF Corporation became the owner of the operating assets and personal property located in Middle Georgia, while BASF Catalysts LLC continued to own all real property located in Middle Georgia.  (Doc. 78-1 at ¶ 6).

[8] BASF SE contends the only confidentiality agreement signed by BASF SE was for an unsolicited inquiry in 2009 from a Florida company predating the Baird-managed Palau Operations offering through which Raven Hill entered into negotiations and the CIM.  (Doc. 78-2 at ¶¶ 18-19).  Once Baird took over the management of the 2010 offering, at least 69 confidentiality agreements were executed in 2010 between the potential purchaser and Baird.  (Doc. 78-2 at ¶ 22).

[9] Tracy Burbank, Supply Chain Manager of BASF Corporation's kaolin clay business, testified that BASF SE is not "involved in the processing, booking, and payment of freight-related contracts for the shipment of Kaolin to Europe."  (Doc. 78-3 at ¶ 3).  However, Burbank goes on to state, "*In most instances*, BASF Corporation (and not BASF SE) arranges for the shipment of kaolin clay from Georgia to Europe for its paper products business."  (Doc. 78-1 at ¶ 5) (emphasis added).  The Defendants do not explain the purpose of the 2009 contracts for the shipment of clay through the port in Savannah nor why BASF SE rather than a different BASF entity executed those contracts.

[10] BASF SE contends only five of the employees who executed these declarations of secrecy were located in Georgia.  BASF SE also contends these declarations were mere reminders to these employees of their existing confidentiality obligations under their contracts with the BASF entity by which they were employed, and the declarations did not create any new contractual obligations to BASF SE or otherwise. (Doc. 78-2 at ¶ 26).

immediately the project manager, Mr. Jürgen Herzog, about every new team member."
(Doc. 75-2 at 4).

Further, Raven Hill made several requests to speak with Palau Operations
management personnel to discuss the condition and safety of the facilities and to visit
the facilities, but the Defendants allegedly denied these requests. (Doc. 28 at ¶¶ 30-
31). On March 29, 2011, Karanikas informed BASF SE employee, Cedric Mutz, of
Raven Hill's request, and Mutz replied by directing the limitations that would be placed
on the site visit including the time, geographic scope, and who could be interviewed.
(Doc. 75-3). In November 2011, Raven Hill again directed a request to visit the facilities
to Karanikas, and on November 16, Herzog himself responded to the request by
suggesting no physical visit was necessary to resolve the outstanding issues. (Doc. 75-
4 at 2). Herzog then requested that Raven Hill direct any future requests for site visits
to Herzog or Mutz. (Doc. 75-4 at 2).

Raven Hill also alleges that BASF SE controlled the flow of information during the
Palau negotiations in addition to the site visits. Correspondence from Herzog to Raven
Hill employees and between BASF employees indicates Herzog was the decision maker
regarding when and how much information would be disseminated to Raven Hill. For
example, an email from Herzog to Steve McLean, a Raven Hill employee, states, "We
have now shared all the information that had been promised during last week's meeting.
We will not share further information or be available for any discussion until we have
received the [letter of intent] redraft and a mark-up of the [ancillary] agreements from
you." (Doc. 75-5 at 2). Further, an internal email between a BASF employee and
Karanikas regarding the dissemination of certain Palau-related information shows that

Karanikas asked Herzog for his input before deciding the information would not be distributed.  (Doc. 75-8 at 2).

Raven Hill contends Herzog, on behalf of BASF SE, led the negotiations.  For instance, Herzog and Mutz lead meetings regarding IT issues.  (Doc. 75-22 at 2).  Herzog is listed on the "Project Palau Teamlist" as "M&A / Project Management" under the heading designating the team members' functions.  (Doc. 75-23 at 4).  Correspondence between Herzog and other BASF employees shows Herzog was consulted about "personnel issues" regarding the Palau Operations and estimates regarding spending on an arc flash at the facilities, which is an event central to Raven Hill's allegations in its complaint.  (Docs. 75-24 at 2; 74-17).  Also, Herzog and Mutz were listed as "required approvals" in the "Project Palau Communications Plan."  (Doc. 74-6 at 2).

Moreover, Raven Hill alleges BASF SE had significant involvement with the Expense Reimbursement Letter.  On March 3, 2011, Matthew Gehrke, a Baird employee, forwarded Raven Hill's proposed reimbursement agreement to Herzog.  (Doc. 74-2 at 1).  Herzog responded that he would discuss the proposed agreement with his superior before calling Gerhke to go over Raven Hill's proposal.  (Doc. 74-2 at 1).

Herzog and BASF SE are further alleged to have remained active in the Palau negotiations until the Parties terminated their discussions.  Correspondence sent in early 2012 shows Herzog and Mutz were still involved in discussions regarding Raven Hill's proposal and the related financing documentation.  (Docs. 75-34; 75-36).  In February 2012, Herzog and Mutz prepared a document titled "De-briefing Project 'Palau,'" which gave an overview of the project and discussed key challenges faced by

the project team.  (Doc. 74-7).  The de-briefing document also identified areas for improvement in future transactions.  Finally, email exchanges between BASF employees show Herzog and Mutz were involved in determining how to respond to Raven Hill's request to resume negotiations and whether that would impact the Defendants' risk under the Expense Reimbursement Letter.  (Docs. 74-1; 75-39).

## II.  DISCUSSION

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

#### 1.  Burden of Proof

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (internal quotation marks and citation omitted).  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'"  *Id.* (citation omitted).  "'Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'"  *Id.* (citation omitted).

#### 2.  *Diamond Crystal* Jurisdictional Analysis

Raven Hill contends this Court has personal jurisdiction over BASF SE pursuant to Georgia's long-arm statute, O.C.G.A. § 9-10-91, and the Due Process Clause of the Fourteenth Amendment.  "A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  *Id.* at

1257-58 (internal quotation marks and citation omitted).  This two-step inquiry is necessary because the long-arm statute does not provide jurisdiction to federal courts in Georgia that is coextensive with procedural due process.  *Id.* at 1259.  Rather, the statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process."  *Id.*  In short, jurisdiction that might appear to be conferred by statute may be negated by due process concerns, and vice versa.  *See id.* at 1261.

### (a) The Long-Arm Statute

Raven Hill argues that the Court has jurisdiction over BASF SE under subsection (1) of the Georgia long-arm statute: "[a] court of this state may exercise personal jurisdiction over any nonresident … in the same manner as if he were a resident of the state, if in person or through an agent, he … [t]ransacts any business within this state … ."  O.C.G.A. § 9-10-91.  *Diamond Crystal* instructs federal courts to interpret Georgia's long-arm statute literally.  593 F.3d at 1264.

> Under subsection (1),
>
> [j]urisdiction exists on the basis of transacting business in this state if (1) the nonresident defendant has purposefully done some act or consummated some transaction in this state, (2) if the cause of action arises from or is connected with such act or transaction, and (3) if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.

*Amerireach.com, LLC v. Walker*, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (2011) (quoting *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 517-18, 631 S.E.2d 734, 737 (2006)).  Significantly, to transact business "a defendant need not physically enter the state" to subject himself to the long-arm statute.  *Diamond Crystal*, 593 F.3d at 1264.  And courts may further consider the nonresident's mail, telephone calls, and other intangible acts that occur while the defendant is outside of Georgia.  *Id.*  The

question is whether, upon analysis of all the defendant's tangible and intangible conduct, "it can fairly be said that the nonresident [defendant] has transacted *any* business within Georgia." *Id.* (emphasis added).[11]

BASF SE makes several arguments as to why it is not subject to this Court's jurisdiction under the Georgia long-arm statute.  First, BASF SE argues that it does not transact any business in Georgia because it "is not authorized to do business in Georgia; it does not have an office, employees, or a registered agent in Georgia; it does not advertise in Georgia; and it generally does not make sales in the state."  (Doc. 67-1 at 10).  But nothing in subsection (1) requires the physical presence of the nonresident in Georgia; personal jurisdiction may be established solely through intangible contacts. Further, it is disingenuous for BASF SE to claim it "cannot be found to have transacted business in Georgia."  (Doc. 67-1 at 10).  Although its sales to Georgia customers may be insubstantial when compared to its gross revenue, BASF SE admits that it did make sales to two Georgia customers from 2011 to 2013 equating to $169,740.

Raven Hill has also produced contracts executed by BASF SE for the exportation of clay from Georgia to Europe and the Mediterranean.  Burbank, BASF Corporation's supply chain manager, implied in his declaration that BASF SE occasionally arranges shipment of kaolin clay from Georgia to Europe for its paper products business. Although BASF SE contends the contracts cited by Raven Hill "are inconsistent with the actual facts" as set forth in Burbank's declaration, it does not provide a satisfactory

---

[11] In *Diamond Crystal* the court adopted a literal definition of the words in the statute, such that "any" means "to any extent" or "in any degree." 593 F.3d at 1264 n.18.  "'Transact' means 'to prosecute negotiations,' to 'carry on business,' 'to carry out,' or 'to carry on.'"  *Id.*

explanation to discount the existence of those contracts.[12]

Second, BASF SE argues that it maintained corporate formalities and any involvement it had during the Palau negotiations was merely as an active parent corporation rather than as an alter ego of the other BASF Defendants, which BASF SE contends is insufficient to subject it to the personal jurisdiction of this Court.  BASF SE further argues that "the transaction was a collaborative effort among BASF SE, BASF [Corporation], and BASF Catalysts[,]" and BASF SE did not act as the "quarterback" of the negotiations as Raven Hill contends.  (Doc. 78 at 9).  BASF SE's argument presumes that Raven Hill must show it was the alter ego for BASF Corporation or BASF Catalysts because it is the parent corporation of the other BASF entities involved in the negotiations.

While Raven Hill does argue that the other BASF Defendants are alter egos of BASF SE, Raven Hill more importantly contends that BASF SE was directly involved in and ultimately controlled the Palau negotiations.  The evidence submitted by Raven Hill shows Herzog and Mutz played vital functions during the course of the Palau negotiations; they were often the decision-makers when it came to requests for information or requests to visit the Palau operations; and they had substantial direct contact with Raven Hill employees.  BASF SE attempts to diminish the importance of this evidence, arguing it was a joint player rather than the quarterback of the negotiations.  To the extent it would matter whether BASF SE was only a "joint player," BASF SE does not refute, and really makes no effort to refute, Raven Hill's allegations that BASF SE played a key role in the Palau operations negotiations.  At this juncture,

---

[12] It is not clear that Raven Hill's causes of action are connected in some way to these contacts. However, BASF SE's intangible contacts, as discussed below, are clearly connected to Raven Hill's complaint, and they are sufficient for the purposes of the Georgia long-arm statute.

the Court must construe all reasonable inferences in favor of the plaintiff.  When that is done, Raven Hill has alleged facts tending to show that BASF SE largely led BASF during the negotiations.

Accordingly, Raven Hill has produced sufficient evidence to subject BASF SE to personal jurisdiction under subsection (1) of the Georgia long-arm statute.

### (b) Due Process

For the Court to exercise jurisdiction over nonresident defendants, it is not enough that the long-arm statute is satisfied.  Personal jurisdiction must also adhere to the Due Process Clause of the Fourteenth Amendment.  "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  "The heart of this protection is fair warning – the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'"  *Diamond Crystal*, 593 F.3d at 1267 (quoting *Burger King*, 471 U.S. at 474).  "Therefore, states may exercise jurisdiction over only those who have established 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"  *Id.*  (quoting *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

Two types of personal jurisdiction exist: general and specific.  General jurisdiction arises from a defendant's contacts with the forum state that "are unrelated to the cause of action being litigated."  *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000).  General jurisdiction further requires continuous and systematic contacts

between the defendant and the forum state.  *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1274 (11th Cir. 2002).  Raven Hill has alleged facts to suggest BASF SE has continuous and systematic contacts with Georgia, including its sales to Georgia customers and its contracts for the exportation of clay from Georgia.  However, there is no evidence that BASF SE targets the Georgia market generally, that it directly owns any property or any interest in any business based in Georgia, or that its officers or employees have ever traveled to Georgia.

This narrows the question to whether BASF SE is subject to specific personal jurisdiction.  Meeting specific jurisdiction requirements is less onerous:  "[T]he fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum … and the litigation results from alleged injuries that arise out of or relate to those activities."  *Diamond Crystal*, 593 F.3d at 1267 (internal quotation marks and citation omitted).  "Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities – that is, purposefully establishing contacts – in the forum state and there must be a sufficient nexus between those contacts and the litigation."  *Id.*  Once the plaintiff makes this showing, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice."  *Id.* (citations omitted).

The evidence shows BASF SE exercised substantial control, or was at least a joint participant in the collaborative effort among the BASF Defendants, over the negotiations for the divestiture of substantial kaolin clay operations and facilities located in this forum.  Further, BASF SE required five Georgia employees of the other BASF Defendants to execute "declarations of secrecy" regarding their participation in the Palau negotiations, which directed those employees to report the inclusion of any new

-14-

team members to Herzog as the project manager.  This litigation clearly arises from the occurrences during Raven Hill's attempted acquisition of the Palau Operations, in which BASF SE was significantly involved.  Thus, BASF SE had fair warning that its actions during the Parties' negotiations would subject it to personal jurisdiction in Georgia courts.

Although BASF SE has sufficient minimum contacts with Georgia, the exercise of personal jurisdiction over it must still comport with traditional notions of fair play and substantial justice.  In making this determination, the Court looks at *Burger King*'s fairness factors: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.  471 U.S. at 477.

BASF SE does not offer any arguments to show this Court's exercise of personal jurisdiction over it would fail to comport with traditional notions of fair play and substantial justice.  Thus, personal jurisdiction against BASF SE is also proper pursuant to the Due Process Clause of the Fourteenth Amendment.  Accordingly, BASF SE's motion to dismiss for lack of personal jurisdiction is **DENIED**.

## B   Motion to Dismiss for Failure to State a Claim

### 1. Standard of Review

To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain specific factual matter to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true,

and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (internal quotation marks and citation omitted).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citation omitted).

### 2.  Contract Claims

BASF SE argues that Raven Hill's contract-related claims fail because BASF SE was not a party to the Expense Reimbursement Letter.  Although the only BASF Defendant identified in the Expense Reimbursement Letter is BASF Corporation, no officer or employee of any BASF Defendant appears to have executed the letter.  (Doc. 4-3 at 3-4).  Raven Hill alleges that BASF SE had significant involvement in the negotiations over the letter and has produced evidence to that effect.  Thus, it is not possible at this point to determine as a matter of law that BASF SE was not a party to the Expense Reimbursement Letter.

### 3.  Fraud Claims

BASF SE contends Raven Hill has failed to plead its fraud claims with particularity as required by Fed. R. Civ. P. 9(b) because Raven Hill does not identify any false representation specifically attributable to BASF SE.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.

Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Allegations of fraud subject to Rule 9(b)'s requirements "'must include facts as to time, place, and substance of the [Defendants'] alleged fraud.'" *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (quoting *U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 566-67 (11th Cir. 1994)).

As the Court previously determined,[13] Raven Hill's complaint sets forth specific dates of the alleged fraud, where the alleged fraud occurred, the substance of the Defendants' alleged fraud, and the Defendants' representatives who engaged in the alleged fraud, and thus, the complaint complies with Rule 9(b).  Raven Hill also identified several meetings where Herzog was present when some of the misrepresentations were alleged to have occurred.  Further, the evidence produced by Raven Hill in response to BASF SE's motion shows Herzog, on behalf of BASF SE, exercised substantial control over the due diligence process and the information made available to Raven Hill.  Accordingly, BASF SE's motion to dismiss for failure to state a claim is **DENIED**.

### C. Motion for More Definite Statement

Pursuant to Fed. R. Civ. P. 8(a)(2), "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 677-78.  The complaint should "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir. 2010) (internal quotation marks and citations omitted).  Fed. R. Civ. P. 12(e) provides:

---

[13] (Doc. 23 at 6-9).

A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

BASF SE contends a more definite statement is required because Raven Hill's complaint does not distinguish between the Defendants or specifically direct any allegations at BASF SE. Given the amount of discovery that has already occurred and the evidence put forward with Raven Hill's response, BASF SE should be able to prepare a response to the second amended complaint. Accordingly, BASF SE's motion for a more definite statement is **DENIED**.

### III. CONCLUSION

For the foregoing reasons, BASF SE's motion to dismiss for lack of personal jurisdiction and failure to state a claim is **DENIED**. BASF SE's request in the alternative for a more definite statement is also **DENIED**.

**SO ORDERED**, this the 21st day of May, 2014.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT