**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **RAVEN HILL PARTNERS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:12-CV-411(MTT)** |
| ) | |
| **BASF CORPORATION, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## ORDER

Defendants BASF Corporation, BASF SE, BASF Catalysts, LLC, and Robert W.

Baird & Co. Inc. ("Baird") have moved for summary judgment.  (Docs. 100; 98; 94; 96).

For the reasons discussed below, BASF Corporation's motion is **GRANTED in part and**

**DENIED in part**, and BASF SE's, BASF Catalysts', and Baird's motions are **GRANTED**.

## I.      BACKGROUND

### A.  The Sales Proposal: "Teasers" and Disclaimers

BASF Corporation is a chemical company headquartered in New Jersey.  (Doc.

111 at ¶ 1).  It is an indirect subsidiary of BASF SE, a publicly-traded European

Company located in Germany.  (Docs. 67-2 at ¶¶ 6, 8, 30; 99 at ¶ 2).  In 2010, the

Board of Directors of BASF SE approved the divestiture of BASF Corporation's kaolin

clay business (the "Kaolin Operations").  (Docs. 156 at 44:3-6, 58:25-59:3, 63:14-16;

111 at ¶¶ 2, 4).[1]  The Kaolin Operations was part of the Paper Chemicals Division,

which is "an umbrella for BASF to host products that go into the paper chemical

---

[1] All citations to depositions cite to the deposition page numbers, as opposed to the CM/ECF
page numbers.

industry" and conducts business "through all different legal entities that BASF owns."
(Docs. 156 at 34:25-36:5, 51:17-24; 111-1 at 17).  Accordingly, Jürgen Herzog, one of
BASF SE's directors of mergers and acquisitions, assisted BASF Corporation with the
proposed sale of the Kaolin Operations.  (Docs. 67-2 at ¶ 25; 99 at ¶ 3).  Herzog formed
a "collaborative project team," which included representatives from BASF Corporation,
BASF SE, and BASF Catalysts.  (Docs. 78-2 at ¶ 6; 156 at 66:20-67:5).  Baird was hired
as financial advisor for the transaction, which became known as "Project Palau."  (Docs.
74-7; 156 at 57:13-23, 67:6-11, 71:15-20; 139 at ¶ 5).

In September 2010, Baird circulated to potential buyers a one-page Summary
Fact Sheet, or "Teaser," that provided information about the Kaolin Operations.  (Docs.
139 at ¶ 7; 157 at 34:19-35:5; 105-3).  The Teaser notes its "sole purpose … is to assist
the recipient in deciding whether to proceed with a further investigation of the Business."
(Doc. 105-3 at 2).  It also provides:

> By accepting the Summary, the recipient agrees to keep strictly
> confidential the information contained herein.  Neither the Business, the
> Parent, nor Baird makes any express or implied representation or
> warranty as to the accuracy or completeness of the information contained
> in this Summary.  The estimates of future financial and operating
> performance were prepared by or derived from information supplied by the
> management of the Business and involve significant assumptions which
> may not be realized in fact.

(Doc. 105-3 at 2).  Plaintiff Raven Hill Partners, Inc., a merchant bank and private
investment firm, received the Teaser and decided it would look into the deal.  (Docs.
139 at ¶¶ 4, 7; 157 at 34:19-35:5).

In order to obtain further information about the Kaolin Operations, Raven Hill
executed a Confidentiality Agreement on September 24, 2010.  (Doc. 100-3).  In the
Confidentiality Agreement, Raven Hill agreed "to treat confidentially any information

concerning [BASF Corporation] or the [Kaolin Operations] that [it] or [its] Representatives[2] may be provided by or on behalf of [BASF Corporation] or the [the Kaolin Operations] (collectively, the 'Evaluation Material')."  (Doc. 100-3 at 2).  Raven Hill also agreed it would not have "any claims whatsoever against [BASF Corporation], the [Kaolin Operations] or Baird or any of their Representatives arising out of or relating to such a Transaction (other than those against the parties to a definitive agreement with you in accordance with the terms thereof)."  (Doc. 100-3 at 3).  Finally, Raven Hill agreed to the following:

> You understand and agree that none of [BASF Corporation], the [Kaolin Operations], Baird or any of their Representatives (i) have made or make any representation or warranty, expressed or implied, as to the accuracy or completeness of the Evaluation Material or (ii) shall have any liability whatsoever to you or any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom.

(Doc. 100-3 at 3).

Raven Hill then received a 67-page Confidential Information Memorandum ("CIM") describing the Kaolin Operations.  (Docs. 4-1; 4-2).  The stated "purpose" of the CIM is "to introduce the reader to the kaolin clay processing operations of BASF Corporation ('Palau' or the 'Business')" and "to assist the recipient in deciding whether to proceed with a further investigation of the Business."  (Doc. 4-1 at 3).  Like the Teaser and Confidentiality Agreement, the CIM contains a number of disclaimers.  The CIM provides that "[n]either the Business nor Baird makes any express or implied representation or warranty as to the accuracy or completeness of the information

---

[2] "The term 'Representative' means, as to any person, such person's affiliates and its and their directors, officers, employees, agents, representatives, advisors (including attorneys, accountants, consultants and other financial advisors), controlling persons and lenders."  (Doc. 100-3 at 2).

contained herein or made available in connection with any further investigation of the Business." (Doc. 4-1 at 3). It provides that "[t]he Business and Baird expressly disclaim any and all liability that may be based on all information set forth in the Memorandum, errors therein or omissions therefrom." (Doc. 4-1 at 3). Finally, the CIM elaborates on why a recipient cannot and should not rely on the information:

> The estimates or projections of future financial and operating performance were prepared by or derived from information supplied by the management of the Business and involve significant assumptions, which may not be realized in fact. Such estimates, projections or other forward-looking statements have been provided to assist in an evaluation of the Business, but are not to be viewed as factual and should not be relied upon as an accurate representation of future results. Actual results may differ materially from those in such estimates, projections or other forward-looking statements.

(Doc. 4-1 at 3).

### B. Prelude to Negotiations: The Proposed Purchase Price and the Expense Reimbursement Letter

On October 8, 2010, Raven Hill informed Baird it was "contemplating … [a] proposal to acquire Palau" and "estimate[d] the enterprise value of Palau to be between $250 million and $375 million." (Doc. 105-22 at 2). On December 8, 2010, Raven Hill presented an "updated proposal" that was "developed on the basis of an enterprise value for Palau of $212 million." (Doc. 105-5 at 2). Raven Hill also requested "exclusivity" based on its intent to "devote substantial resources" to completing due diligence and preparing and negotiating a final agreement. (Docs. 105-5 at 4; 111 at ¶ 18). Unwilling to grant exclusivity, Baird suggested that "BASF could instead offer to Raven Hill the reimbursement of part of the due diligence expenses in case of an unsuccessful Final Bid." (Doc. 114-10 at 4). On February 2, 2011, BASF Corporation

and Raven Hill executed such an agreement, which provided that Raven Hill could be reimbursed up to $300,000 under certain conditions.  (Doc. 111 at ¶ 21).

On February 15, 2011, Raven Hill informed Baird that it "has valued the Purchased Assets, plus net working capital (less inventory, which is included in the Purchased Assets definition) in the Divested Business ('Net Working Capital') at US $222.7 million."  (Docs. 111 at ¶ 19; 105-24 at 3).  Accordingly, Raven Hill wrote that "the total cash consideration … we are prepared to pay for the Purchased Assets plus the Net Working Capital[] is the amount of US $222.7 million, subject to adjustment as noted in the Overview."  (Doc. 105-24 at 3).  In the Overview, Raven Hill explains that

> we understand … the BASF Entities intend to retain certain working capital assets and liabilities, including any cash balances, trade accounts receivable and trade liabilities.  Consequently, we will need to establish a protocol, to be set forth in the Purchase Agreement, for a working capital adjustment to the Purchase Price based any [sic] net deficiency or surplus in working capital as at the closing time.  As of December 31, 2010, we estimated Net Working Capital to be US $26.1 million.

(Doc. 105-24 at 3).  In other words, the BASF entities had decided to exclude some working capital from the transaction, necessitating an adjustment to the purchase price.

Raven Hill again requested "exclusivity" in consideration of Raven Hill "incur[ring] substantial costs to secure its financing commitments."  (Doc. 105-24 at 11).  Still unwilling to grant exclusivity, BASF Corporation agreed to increase the expense reimbursement cap.  On March 15, 2011, BASF Corporation and Raven Hill executed a superseding Expense Reimbursement Letter (the "ERL").  (Doc. 105-7).  The ERL "confirms" Raven Hill and BASF Corporation's "mutual understandings concerning the reimbursement of costs and expenses incurred by [Raven Hill] in connection with the proposed acquisition of the global kaolin clay business of BASF Corporation ('Palau') by

[Raven Hill] (the 'Transaction')."  (Doc. 105-7 at 2).  "In consideration of the resources which [Raven Hill] propose[d] to expend," BASF Corporation agreed "to reimburse [Raven Hill] for all of its reasonable documented out-of-pocket costs and expenses … reasonably incurred in respect of the proposed Transaction … up to [$1,250,000]." (Doc. 105-7 at 2).  BASF Corporation agreed it would pay Raven Hill within 30 days after the date on which "[BASF Corporation] notifies [Raven Hill] in written form that [it] has either abandoned the proposed Transaction or determined to discontinue discussions with [Raven Hill] regarding the proposed Transaction."  (Doc. 105-7 at 2). The ERL further provides that, "[n]otwithstanding the foregoing,"

> (i) [BASF Corporation] shall be obligated to reimburse [Raven Hill] … in an amount up to [$833,000], if [Raven Hill] determines to reduce the proposed purchase price to an amount less than US $222.7 million, expressed on an enterprise value (cash and debt free) basis (which includes normal level of inventories, trade accounts payable and trade accounts receivable), plus a maximum of $6.8 million in one-time infrastructure and separation costs ("Proposed Purchase Price"), in the event that [Raven Hill's] determination is based upon a determination by [Raven Hill] that the information concerning the business of Palau presented in the CIM is incorrect in any material respect ("Incorrect Information"), and

> (ii) [BASF Corporation] shall not be obligated to reimburse [Raven Hill] … in the event that [Raven Hill] determines not to proceed with the proposed Transaction at the Proposed Purchase Price for a reason other than Incorrect Information.

(Doc. 105-7 at 3).  Finally, the ERL provides that it "shall be governed by, and construed in accordance with, the laws of the State of New Jersey, applicable to agreements made and to be performed within such State."  (Doc. 105-7 at 3).

### C.  The Negotiations: Adjustments to the Proposed Purchase Price and "Abandonment"

Shortly after the execution of the ERL, BASF Corporation announced that the Kaolin Operations' financial performance for the first four months of 2011 was below expectations.  (Docs. 100-1 at 10; 111 at ¶ 28; 105-9 at 3).  On June 13, 2011, Raven Hill informed Baird that it "needed to fully understand the magnitude and causes of the shortfall in Palau's 2011 revenue and EBITDA."  (Docs. 111 at ¶ 29; 105-8 at 2).  Raven Hill's letter notes how it had recently "confirmed [its] proposed purchase price of $222.7 million (including working capital adjustment[)]" on April 29 and reiterates that it "remain[s] committed to this purchase price."  (Doc. 105-8 at 3).  But the letter goes on to say that "the shortfall in Palau's 2011 performance has a direct and proportional effect on the consideration available at closing."  (Doc. 105-8 at 3).  Accordingly, Raven Hill says "the purchase price needs to be divided into two tranches."  (Doc. 105-8 at 3).

First, Raven Hill proposed that it pay a "fixed consideration" of "$173.4 million (including the net working capital in the divested business)."  (Doc. 105-8 at 3).  Raven Hill acknowledged that "the actual cash payable at closing would be net of a $26.1 million working capital adjustment," since "Palau is being conveyed without accounts receivable, prepaid expenses, accounts payable and other accrued liabilities."  (Doc. 105-8 at 3).  Second, Raven Hill proposed that it pay a "contingent consideration" of $49.3 million, which would be "payable when, and to the extent that, Palau quickly returns to the trend line of profitability set out in the original projection."  (Doc. 105-8 at 3).

Raven Hill claims that in lieu of accepting this "transaction structure" (which clearly was an attempt to maintain a purchase price of $222.7 million), the Defendants

proposed that the Parties simply reduce the purchase price.  (Doc. 111 at ¶ 28).  For example, on July 9, 2011, Herzog informed Edwin Nordholm, an advisor to Raven Hill, that "our offer for a one-time purchase price reduction of 15-20 Mio. USD still stands.  It would make the deal much easier for everybody than this rather cumbersome earn-out mechanism.  We would live with it, but only on the basis of a much smaller contingent consideration and the acceptance of the permitted EBITDA adjustments, we proposed." (Docs. 157 at 13:12-16; 116-4 at 5).  Also, in their September 2011 draft letter of intent, the BASF entities proposed that "the Purchase Price would not exceed $182.7 million." (Docs. 111 at ¶ 30; 105-10 at 2).

On November 13, 2011, Raven Hill informed Uwe Liebelt[3] that it has "now concluded [its] business review of Palau."  (Doc. 105-13 at 2).  The letter notes the review has turned up "some surprises in terms of capital expenditures," including that "[t]he renovation of two impounds will require $24 million in previously undisclosed capital expenditures from 2016 through 2018."  (Doc. 105-13 at 2).  The letter also notes the review has "confirmed that Palau's business is under pressure" and that "Palau's financial performance is likely to worsen in 2012."  (Doc. 105-13 at 2-3).  To resolve these issues, Raven Hill suggests "fixing a single price for the business.  Specifically, the gross purchase price would be reduced from $222.7 million to $176.1 million.  Net of the $26.1 working capital adjustment, the purchase price for the Purchase Agreement would be restated to $150.0 million."  (Doc. 105-13 at 3).  However, the letter also says Raven Hill would "pay a correspondingly higher price at closing" should "all working

---

[3] Liebelt, an employee of BASF Schweiz AG, was president of the Paper Chemicals Division and became involved in the negotiations beginning in Fall 2011.  (Doc. 156 at 97:8-99:4).

capital assets and related liabilities [be] included in the transaction." (Doc. 105-13 at 3). The letter acknowledges there "will be more than one way to reach a mutually acceptable solution" and clarifies that "[i]n proposing these solutions, [Raven Hill] [is] not intending to foreclose alternatives." (Doc. 105-13 at 2).

On November 23, 2011, Liebelt responded and made a "counterproposal." (Doc. 105-14 at 2). With respect to purchase price, the letter says,

> BASF agrees to substitute a purchase price based on the previously developed earn-out mechanism for a fixed purchase price. Instead of a fixed purchase price of $150 million (net of the working capital adjustment of $26.1 million) as proposed by Raven Hill, BASF proposes a purchase price of $165 million (or $191.1 million gross purchase price adjusted for $26.1 million in working capital).

(Doc. 105-14 at 2). The letter also discusses a number of other issues, such as the potential for including in the deal accounts receivables, accounts payables, and water barrier coating technology. (Doc. 105-14 at 2-3). The letter concludes by saying, "[w]e regard this as final and ask Raven Hill to respond on its acceptance of this proposal no later than December 1, 2011." (Doc. 105-14 at 3).

On November 29, 2011, Raven Hill responded with its "best and final proposal." (Doc. 105-15 at 2). The letter says Raven Hill will accept the proposed purchase price of $165 million if BASF accepts several conditions, including capital expenditure and working capital requirements. (Doc. 105-15 at 2-3). On December 5, 2011, Liebelt responded to what, in its view, was Raven Hill's "counterproposal" to its "final offer." (Doc. 100-23 at 2). The letter says, "[Raven Hill] did not accept BASF's final offer but instead, [Raven Hill] countered" and "[y]our response constitutes a rejection of BASF's final offer and a decision by [Raven Hill] not to proceed with the proposed transaction." (Doc. 100-23 at 2). On December 19, 2011, Liebelt sent another letter to Raven Hill,

informing it that "BASF's view on the status of the transaction as stated in our letter to you dated December 5, 2011 remains unchanged." (Doc. 100-42 at 2). The letter goes on to say,

> Given the statements that you made in your final proposal letter of November 29, 2011, in which Raven Hill made the acceptance of BASF's final purchase price proposal subject to BASF accepting all the other conditions listed in Raven Hill's letter in its entirety, including a new submission date for a financing    commitment, Raven Hill's sudden change concerning some of these conditions more than surprised us and is not regarded by BASF as a credible proof of Raven Hill's continued interest, commitment or ability to acquire the Palau business. Based on Raven Hill's mere declaration of its intent, BASF doesn't see a possibility to change its view on the status of the transaction.

(Doc. 100-42 at 2).

On January 31, 2012, Raven Hill sent Liebelt a letter stating, "[a]s I indicated in conversations and correspondence in December, [Raven Hill] accept[s] the economic terms set out in your letter of November 23rd and our telephone conference on November 24th." (Doc. 105-17 at 2). The letter also says, "[i]n your letter of December 19th, you expressed concerns about 'Raven Hill's … ability to acquire the Palau business.' You indicated your need to have more than a 'mere declaration' on our part. We believe that this letter provides the comfort you are seeking. The attachments describe and support the financing which has been put in place." (Doc. 105-17 at 2).

On February 17, 2012, Liebelt responded to Raven Hill's January 31 letter as follows:

> While BASF appreciates the efforts that [Raven Hill] has undertaken since its initial rejection of BASF's final offer of November 23, 2011, including those detailed in the letter from [Raven Hill] dated January 31, 2012, BASF's position is firm. Neither [Raven Hill's] November 29, 2012 counterproposal to BASF's final offer nor the January 31, 2012 proposal from [Raven Hill] are sufficient to persuade BASF to reopen negotiations.

(Doc. 100-31 at 2).  The letter also says, "[g]iven the changes and need for incremental time and effort, BASF regards [Raven Hill's] most recent letter is [sic] a new offer. BASF is not interested in entertaining [Raven Hill's] proposal to reopen negotiations for the sale of BASF's Palau operations."  (Doc. 100-31 at 2).

On February 23, 2012, Raven Hill acknowledged receipt of the February 17, 2012 letter and expressed that it was "disappointed and frustrated with [the] decision not to pursue this transaction after more than a year of effort on our part to meet BASF's ever-changing needs."  (Doc. 100-33 at 2).  More directly, Raven Hill noted it was "at a loss to comprehend the self-serving characterization of events as reflected in your recent correspondence."  (Doc. 100-33 at 2).  Raven Hill requested payment of $1.25 million pursuant to the ERL and attached an expense report.  (Doc. 100-33 at 3-6).  On March 16, 2012, BASF Corporation declined to reimburse Raven Hill for any expenses. (Doc. 105-20).  The letter states,

> Because [Raven Hill] failed to satisfy a primary condition of the [ERL] by deciding not to proceed with the proposed Transaction at the Proposed Purchase Price for a reason other than Incorrect Information and because [Raven Hill] rejected what BASF Corporation clearly stated in writing was its final offer, BASF Corporation has no obligation to reimburse [Raven Hill] for any expenses [Raven Hill] incurred as a result of the aborted transaction.

(Doc. 105-20 at 3).

## II.   DISCUSSION

### A.  Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### B. Analysis

#### 1. Breach of Contract (Count I)

Raven Hill claims BASF Corporation[4] breached the ERL by refusing to reimburse its due diligence costs and expenses.  BASF Corporation argues Raven Hill failed as a matter of law to satisfy the conditions in the ERL that would entitle it to reimbursement: Raven Hill is not entitled to $1.25 million because its November 13, 2011 bid was lower than the Proposed Purchase Price of $222.7 million, and it is not entitled to $833,000 because it reduced its purchase price for reasons other than determining that the CIM contained incorrect information.  Raven Hill responds that it is entitled to $1.25 million because BASF Corporation abandoned the transaction and that the $833,000 "cap" was never triggered because it did not determine to reduce the proposed purchase price. Even if it did reduce the proposed purchase price, Raven Hill argues it is entitled to $833,000 because it did so based on its determination that the CIM contained incorrect information.

"To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result."[5] *Murphy v. Implicito*, 392 N.J. Super. 245, 265, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007) (citation omitted).  "The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury."

---

[4] Raven Hill admitted at oral argument that Counts I and II are brought only against BASF Corporation.  (Doc. 152 at 71:3-13, 73:8-17).

[5] The Parties agree New Jersey law governs the ERL.

*Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 420 (3d Cir. 2013) (citing *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 814 A.2d 1108, 1113-14 (N.J. Super. Ct. App. Div. 2002)).

The ERL is far from a model contract.[6]  The part of the ERL addressing the reimbursement cap of $1.25 million, which Raven Hill calls the "page one obligation," includes no mention of a proposed purchase price and certainly includes no limiting condition making payment of the $1.25 million cap contingent upon a particular offer. But, the second page of the ERL discusses an alternative reimbursement cap of $833,000 in the event "[Raven Hill] determines to reduce the proposed purchase price to an amount less than US $222.7 million."  (Doc. 105-7 at 3).  BASF Corporation argues this necessarily means that Raven Hill had to offer $222.7 million in order to recover up to $1.25 million in due diligence costs and expenses.  (Docs. 100-1 at 15; 149 at 8).  And, because Raven Hill's "November 13, 2011 bid of $150 million [was] lower than the required minimum purchase price of $222.7 million set in the ERL," Raven Hill is not entitled to $1.25 million.  (Doc. 100-1 at 15).  Thus, BASF Corporation argues that whether it abandoned the transaction or determined to discontinue discussions with Raven Hill is "irrelevant."  (Doc. 100-1 at 15).

The most favorable interpretation of the ERL available to BASF Corporation is that it does not have to reimburse expenses up to $1.25 million in the event *Raven Hill determines* to reduce the proposed purchase price to an amount less than $222.7 million.  Given the disputed and confusing sequence of events during the subsequent negotiations, the Court cannot say as a matter of law that Raven Hill determined to

---

[6] Not surprisingly, Raven Hill and BASF Corporation blame each other for drafting it.  (Docs. 137 at 7; 149 at 9 n.3).

reduce the purchase price.  There is evidence that the Defendants concluded that a reduction in the purchase price was necessary, making an "offer for a one-time purchase price reduction" of $15-20 million after Raven Hill's June 13, 2011 proposal and, in September, proposing that the purchase price "not exceed $182.7 million." (Docs. 116-4 at 5; 105-10 at 2).  Moreover, it cannot be determined as a matter of law whether Raven Hill's June 13, 2011 proposal, which with some machinations purports to state an offer of $222.7 million, equaled the proposed purchase price.  (Docs. 105-8 at 3; 156 at 185:9-186:3).  Finally, Raven Hill argues that BASF Corporation also effectively reduced the purchase price by deciding not to divest certain assets that comprised the definition of "Proposed Purchase Price" in the ERL, including trade accounts payable and trade accounts receivable.  (Doc. 137 at 10).  Based on the apparent need for a working capital adjustment, the Court cannot say this argument fails as a matter of law.  Therefore, BASF Corporation has not shown that Raven Hill failed as a matter of law to satisfy the conditions in the ERL that would entitle it to $1.25 million.

Nor can the Court find as a matter of law that Raven Hill is not entitled to recover expenses up to $833,000 because it proposed a lower purchase price for reasons other than its determination that the CIM contained incorrect information.  The CIM states that although BASF Corporation's "waste material retention ponds" required capital expenditures during 2008 and 2009, "investment in these assets is now complete." (Doc. 4-2 at 36).  In October 2011, Raven Hill learned that BASF Corporation's "impound facilities" or "impounds" would require $24-32 million in capital expenditures. (Docs. 111 at ¶ 7; 113-6 at 3).  Raven Hill's November 13, 2011 letter states that its

"business review" turned up several "surprises," one of which was that "[t]he renovation of two impounds will require $24 million in previously undisclosed capital expenditures from 2016 through 2018."  (Doc. 105-13 at 2).  Citing the testimony of several Baird and BASF Corporation employees, Raven Hill argues that the impounds in need of considerable investment are the retention ponds which, according to the CIM, require no further investment.[7]  Raven Hill proposed resolving this issue by reducing the price from $222.7 million to $176.1 million.  (Doc. 105-13 at 3).

For several reasons, BASF Corporation argues Raven Hill's reduction in purchase price was not based on its determination that the CIM contained incorrect information.  First, it argues the reference in the CIM to waste material retention ponds is not a reference to impound ponds.  BASF Corporation does not address the testimony of Roszak, but instead relies on the testimony of Patrick Robertson, one of Raven Hill's advisors, that there is a distinction between an "impound pond" and a "storm water pond."  (Doc. 160 at 25:6-15, 55:20-56:15).  However, Robertson also testified that a "waste management retention pond" is the same as an "impound pond." (Doc. 160 at 57:19-25).  Clearly, there is a genuine dispute over whether Raven Hill believed that the reference in the CIM to waste material retention ponds was a reference to the impounds that required $24 million in capital expenditures.

BASF Corporation next argues that even if these are the same thing, the costs Raven Hill identifies in its November 13, 2011 proposal relate to projections for 2016 –

---

[7] For example, David Roszak, a BASF Corporation employee, testified that "a waste material retention pond is the same as an impound."  (Docs. 137 at 11; 158 at 81:5-18).  Nick Zarcone, a Baird employee, testified that "folks at BASF" "talked about the need to maintain the ponds which anybody who has a retention pond or impound pond, there is some maintenance that goes along with that."  (Docs. 137 at 11; 159 at 260:19-23).  The Parties dispute whether Zarcone uses the terms "interchangeably."  (Docs. 137 at 11; 149 at 14 n.7).

2018.  BASF Corporation argues the CIM was "silent" as to projected capital expenditures for later periods in time because it only covered a 2010 – 2013 time period.  To support this, BASF Corporation relies on a section of the CIM, "Basis of Financial Information," which says the "following discussion and analyses summarize the Business' … projections for the years ending December 2011 – 2013."  (Doc. 4-2 at 28).  The Court cannot say as a matter of law that although the CIM said "investment in these assets is now *complete*," Raven Hill should have known that the CIM really meant complete until 2013.  (Doc. 4-2 at 36) (emphasis added).

Finally, BASF Corporation acknowledges that under the ERL Raven Hill is the party who determines whether the CIM contained incorrect information, but argues Raven Hill cannot make that determination arbitrarily or unreasonably.  The discretion afforded to Raven Hill is not "unbridled," and Raven Hill's "performance under the contract is tempered by the implied covenant of good faith and fair dealing and the reasonable expectations of the parties."  *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 250, 773 A.2d 1121, 1130 (2001).  However, the Court cannot say as a matter of law that Raven Hill exercised its discretion in such a way that it breached the implied covenant of good faith and fair dealing.  *Id.*

Therefore, BASF Corporation's motion for summary judgment on Count I is **DENIED**.

### 2.  Breach of Good Faith and Fair Dealing (Count II)

Raven Hill claims BASF Corporation orchestrated events to make it appear that Raven Hill abandoned the transaction and thus had forfeited its right to recover its expenses.  Or, as Raven Hill puts it, BASF Corporation "fabricated" Raven Hill's

abandonment of the transaction.  This, Raven Hill argues, breached the covenant of good faith implied in the ERL.

"A covenant of good faith and fair dealing is implied in every contract in New Jersey."  *Wilson*, 168 N.J. at 244, 773 A.2d at 1126.  "[T]he breach of the implied covenant arises when the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Wade v. Kessler Inst.*, 172 N.J. 327, 345, 798 A.2d 1251, 1262 (2002) (citation and internal quotation marks omitted).  "Proof of 'bad motive or intention' is vital to an action for breach of the covenant."  *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225, 864 A.2d 387, 396 (2005).  "[T]he presence of bad faith is to be found in the eye of the beholder or, more to the point, in the eye of the trier of fact."  *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 263, 791 A.2d 1068, 1080 (N.J. Super. Ct. App. Div. 2002).

BASF Corporation argues there is no evidence it attempted to "fabricate" Raven Hill's abandonment of the transaction.  In its view, Raven Hill's November 29, 2011 offer was a "counterproposal" rejecting BASF Corporation's "final offer" and effectively terminating negotiations.  BASF Corporation relies on its December 5 and 19 letters which "reiterated" its position that Raven Hill's "counterproposal" constituted a "rejection" of its "final offer and a decision by [Raven Hill] not to proceed with the proposed transaction."  (Docs. 100-23 at 2; 100-42 at 2).  BASF Corporation further argues it was not bad faith to send a "final offer" in light of the lengthy negotiations and due diligence period and also relies on a provision in the Confidentiality Agreement

giving it the right "to terminate discussions and negotiations … at any time for any reason whatsoever, in its sole discretion." (Doc. 100-3 at 3).

Raven Hill responds first that its November 29, 2011 offer did not end the negotiations, pointing to evidence that BASF Corporation continued to negotiate. For example, a December 13, 2011 letter from Raven Hill to Liebelt says, "[t]hank you for making the time to speak today. I am writing to reiterate the points made in our conversation today." (Doc. 117-4 at 5). The letter confirms that Raven Hill "remain[s] committed to acquiring Palau," "accept[s] BASF's economic proposal," "can demonstrate sources of funding which exceed funds owed to BASF on closing," and "is prepared to sign an LOI." (Doc. 117-4 at 5-6). That same day, Herzog forwarded Raven Hill's letter to Baird and informed Baird that BASF had a call with Raven Hill in which "[Raven Hill] [was] prepared to accept everything that we had asked for and also claimed that, contrary to what we had been told previously, they would have their financing largely in place." (Doc. 117-4 at 4). Herzog goes on to say, "[i]t is not clear to us whether they are serious about what they state or whether these are just tactics. We are now discussing internally how to deal with that." (Doc. 117-4 at 4).

Consistent with the continued negotiations, Raven Hill submitted a proposal on January 31, 2012. On February 4, 2012, Liebelt wrote to Raven Hill, "I will continue to discuss your proposal with the team and the board. The material you have provided is absolutely clear. I think we understand the financing structure you suggest." (Doc. 118 at 4-5). Internal emails also suggest that BASF was considering Raven Hill's proposal.

On February 2, 2012, Herzog asked Liebelt and Charles Schmidt,[8] "How does EP[9] want to react on this?"  (Doc. 118-3 at 5).  In response, Schmidt says,

> [F]irst I think we need some input from you as to the significance of the 'commitment' referenced below.  To me, this looks like a term sheet with another round of due diligence required before moving forward.  If this is indeed the case, then we have no more surety, no higher purchase price and all the risk that lead [sic] us to abandon this process at the end of last year.  If this is not the case, then please clarify what is now different.  Failing a material difference, then EP's position has not changed.

(Doc. 118-3 at 4).  Liebelt responded, "I fully support [Schmidt's] comments. … Bottom line, from my perspective, this is not the outstanding opportunity which would make us start a new divestiture process.  This is not a bit better than what we had for months.  Neither from a money, nor from a timing perspective.  Only that the role of the bad guy is now moved to [PNC Bank]."  (Doc. 118-3 at 4).  A January 31, 2012 email amongst Baird employees suggests that "Raven Hill still wants to complete the transaction and is willing to accept all the terms BASF requested back in November including a purchase price of $165 million plus $9 million to reimburse BASF for separation costs.  [Raven Hill] has arranged its financing."  (Doc. 117-3 at 3).

But even though negotiations continued, Raven Hill argues that BASF Corporation was manipulating events to make it appear that Raven Hill had abandoned the transaction and thus could not recover under the ERL.  On December 13, 2011, Liebelt forwarded Raven Hill's December 13, 2011 letter to Herzog and wrote,

> For now the party line is: RHP didn't accept our conditions, the deal is off.  This is what we told the supervisory board recently.  I suggest to view this

---

[8] Schmidt was the senior vice president for the Paper Chemicals Division in North America and reported to Liebelt.  (Doc. 156 at 168:7-13).

[9] EP is the abbreviation or organizational code for the Paper Chemicals Division.  (Doc. 156 at 184:2-6, 226:9-25).  Herzog testified he "wanted to get an answer on this from Mr. Liebelt and Mr. Schmidt."  (Doc. 156 at 226:22-25).

as a new deal.  In this case, I also would request RHP to void the
reimbursement letter and start fresh.  What do you think?

(Doc. 114-14 at 3).  That same day, Herzog informed Baird,

> For us, the original deal is off, since they did not accept our final proposal
> but countered it.  If we continue to talk to them, then only based on very
> clear terms and conditions, set by BASF and a very tight timeline to sign
> the LOI, the definitive agreements and to provide us with a financing
> commitment.

(Doc. 117-4 at 4).  On February 2, 2012, Cedric Mutz, a member of the project team,

responded to Raven Hill's proposal as follows:

> [T]his proposal is a far cry from anything that we could call 'secured'
> financing. Therefore, we are still pretty much where we left in December,
> and I believe that we should not entertain a return to the negotiation table.
> We now need to think about how to best respond, taking into
> consideration the risk that RHP may demand the reimbursement of part of
> their due diligence expenses under the existing Reimbursement Letter
> agreement.

(Docs. 118-3 at 3; 161 at 19:20-23).  Herzog responded that he "agree[d] with

everything" and, "[a]s Cedric pointed out, we now have to determine how best to answer

this proposal."  (Doc. 118-3 at 3).  Liebelt responded to Herzog by saying, "I suggest to

discuss [sic] our message towards all parties involved early next week."  (Doc. 118-8 at

3).

BASF Corporation argues that even if there is evidence that it attempted to

fabricate Raven Hill's abandonment of the transaction to avoid its obligations under the

ERL, that evidence is "irrelevant," at least with regard to the $1.25 million cap, because

"[Raven Hill] has not met the condition where the question of abandonment becomes a

pertinent inquiry (i.e., a purchase price of $222.7 million)."  (Doc. 149 at 18).  This, of

course, is the same argument BASF Corporation makes in response to the breach of

contract claim.  It is even less availing here.  BASF Corporation contends Raven Hill

failed to satisfy the literal[10] terms of the ERL and thus cannot recover its expenses.
According to BASF Corporation, Raven Hill walked away from the deal and it lowered
the purchase price for reasons other than incorrect information.  But there is evidence
suggesting that BASF Corporation maneuvered Raven Hill both into rejecting its final
offer and lowering the purchase price.  A jury could find that BASF Corporation did this
so that it could avoid its obligations to reimburse Raven Hill's expenses.  In this event, a
jury could conclude that BASF Corporation breached its duty to perform the contract in
good faith.  *See Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 424, 690 A.2d 575,
589 (1997); *Seidenberg*, 348 N.J. Super. at 257, 791 A.2d at 1076 (noting that the
covenant "allow[s] redress for the bad faith performance of an agreement even when
the defendant has not breached any express term").

Therefore, BASF Corporation's motion for summary judgment on Count II is
**DENIED**.[11]

### 3. Fraudulent Misrepresentations (Count III) and Fraudulent Inducement (Count IV)[12]

Raven Hill argues the Defendants made fraudulent misrepresentations in
connection with the proposed sale of the Kaolin Operations and fraudulently induced it
to enter into the ERL.

---

[10] Literal being a bit of a stretch given the ambiguities in the ERL.

[11] BASF Corporation argues Count II must be dismissed because the New Jersey statute Raven Hill cites in its amended complaint, N.J.S.A. § 12A:1-304, does not create an independent cause of action.  (Docs. 100-1 at 19; 4 at ¶ 52).  Neither Party suggests that the statute, which governs contracts within the Uniform Commercial Code, governs the ERL.  Regardless, New Jersey's common law clearly recognizes a cause of action based upon the implied covenant of good faith and fair dealing.  *See, e.g.*, *Sons of Thunder*, 148 N.J. at 425, 690 A.2d at 589; *Valcom, Inc. v. Vellardita*, 2014 WL 2965708, at *8 (D.N.J.) ("An implied covenant cause of action is independent from the action for breach of contract." (citations omitted)).

[12] The Parties agree that Georgia law applies to both counts.  (Docs. 149 at 18 n.15; 152 at 63:5-8).

> To survive a motion for summary judgment in an action for fraud (including fraudulent inducement), a plaintiff must come forward with some evidence from which a jury could find each of the following elements: false representation; scienter; intent to induce the plaintiff to act or refrain from acting; justifiable reliance; and damage proximately caused by the representation.

*JarAllah v. Schoen*, 243 Ga. App. 402, 403-04, 531 S.E.2d 778, 780 (2000) (citation omitted).  Raven Hill relies on the same evidence for both counts.  (Doc. 152 at 65:4-11).  Raven Hill argues the Defendants made misrepresentations about the financial history and forecasts for the Kaolin Operations, the cost of the arc flash mitigation project, the number of arc flashes that had occurred, the developmental status and value of the water barrier coating technology, whether and how the water barrier coating technology would divest to Raven Hill, the status of its union relationships, a potential tax benefit (even though the Kaolin Operations faced potential tax liabilities), the viability of the Kaolin Operations, ongoing litigation, and the status of the impound ponds.  (Docs. 111 at ¶¶ 7, 50; 137 at 17; 138 at ¶ 7).

The Defendants argue both fraud claims fail as a matter of law because Raven Hill agreed at the outset of negotiations it could not rely on any information regarding the Kaolin Operations, and it would not sue the Defendants based on the inaccuracy of such information.  They argue that such an agreement between two sophisticated business entities is neither unusual nor unconscionable and, in fact, facilitates the free exchange of information prior to a definitive agreement.  The Court agrees.

To receive information about the Kaolin Operations, Raven Hill executed the Confidentiality Agreement.  (Doc. 100-3 at 2).  Accordingly, Raven Hill agreed that it would not have "any claims whatsoever against [BASF Corporation], the [Kaolin Operations] or Baird or any of their Representatives arising out of or relating to such a

-23-

Transaction" and that no one would have "any liability whatsoever to you or any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom."  (Doc. 100-3 at 3).  Raven Hill also agreed that no one made "any representation or warranty, expressed or implied, as to the accuracy or completeness of the Evaluation Material."  (Doc. 100-3 at 2).  The CIM contains similar disclaimers.  (Doc. 4-1 at 3).

Although acknowledging its agreement to these disclaimers, Raven Hill nevertheless argues that it should not be bound by the terms of the Confidentiality Agreement and that the disclaimers in the CIM do not render its reliance unreasonable as a matter of law.  First, Raven Hill argues the ERL directs it to rely on the CIM and so the Defendants "waived any such protections or defenses by including the 'Incorrect Information' language when it wrote (and executed) the ERL."  (Doc. 137 at 20).  Raven Hill cites the doctrine of waiver under New Jersey law, which "involves the intentional relinquishment of a known right" and requires "that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 291, 544 A.2d 377, 384 (1988).

Apart from the fact that New Jersey law has no bearing on the issue, the execution of a second agreement does not necessarily constitute a waiver.  The Confidentiality Agreement specifically contemplated the execution of such an agreement: The Parties agreed Raven Hill would not have any claims relating to the proposed transaction "other than those against the parties to a definitive agreement with you in accordance with the terms thereof."  (Doc. 100-3 at 3).  Moreover, the terms of the ERL do not modify the terms of the Confidentiality Agreement, but provide only that

Raven Hill can recover up to $833,000 in due diligence costs and expenses in the event it determines to reduce the proposed purchase price based on a determination that the CIM contains incorrect information.  (Doc. 105-7 at 3).  This limited remedy for "Incorrect Information" did not abrogate the disclaimers in the Confidentiality Agreement. Therefore, Raven Hill has not shown why it can escape its obligations based on a "waiver" by the Defendants.

Second, Raven Hill argues the disclaimers found in the Confidentiality Agreement are insufficient to disclaim fraud.  Again citing New Jersey law, Raven Hill argues that because "the misrepresented facts were solely within Defendants' knowledge – even if there were *specific* disclaimers, [Raven Hill's] reasonable reliance would not be undermined."  (Doc. 119 at 21).  Even if New Jersey law were applicable, this "peculiar-knowledge exception" has been rejected "in circumstances where sophisticated parties could have easily insisted on contractual protections for themselves."  *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 115 (Del. 2012).

Finally, Raven Hill argues that "disclaimers, particularly non-negotiated, boilerplate disclaimers of intentional fraud found in a form contract – and subsequently disavowed by Defendants – should be disfavored and void on policy grounds, or are unconscionable."  (Doc. 119 at 22).  Raven Hill once again cites New Jersey law for the proposition that a "contract is unenforceable if its terms are manifestly unfair or oppressive and are dictated by a dominant party."  (Doc. 119 at 22).  Raven Hill cites no Georgia law to support this argument, nor does it elaborate on why it believes the terms of the Confidentiality Agreement are oppressive.

Nothing in Georgia law bars the parties from agreeing to the terms found in the Confidentiality Agreement.  "It is axiomatic that contracts must be construed to give effect to the parties' intentions, which must whenever possible be determined from a construction of the contract as a whole." *First Data POS, Inc. v. Willis*, 273 Ga. 792, 795, 546 S.E.2d 781, 784 (2001).  Although justifiable reliance is generally a question for a jury, "in some cases, the answer may appear so clearly that the question can be decided by a court as a matter of law." *Raysoni v. Payless Auto Deals, LLC*, 296 Ga. 156, 157, 766 S.E.2d 24, 26 (2014) (citing *Novare Grp. v. Sarif*, 290 Ga. 186, 190, 718 S.E.2d 304 (2011)).  Such an answer is clear where, as here, "the contract language prevails." *Novare Grp., Inc.*, 290 Ga. at 190; *see also Legacy Acad., Inc. v. Mamilove, LLC*, 2015 WL 1773755, at *3 (Ga.) (finding reliance unreasonable as a matter of law).

The Parties' intentions in entering into the Confidentiality Agreement are clear: Raven Hill would receive information about the Kaolin Operations if it agreed it could not rely on the information as complete and turn around and sue the Defendants for fraud. Raven Hill accepted these terms.  If a sophisticated party could argue its way around such an agreement in the way Raven Hill is trying to do, those agreements would never survive unsuccessful negotiations.  Jilted suitors could always sue despite their express agreements to the contrary.  Potential sellers would never feel secure in disclosing voluminous and sensitive information during negotiations if the unsuccessful purchaser could disregard its contractual obligations and mine from the data ammunition for a lawsuit.

That is not to say that there cannot be remedies when a seller provides incorrect information.  Rather, it is to say that sophisticated parties can define those remedies,

which is exactly what happened here.  After agreeing to the disclaimers in the

Confidentiality Agreement and the CIM, the Parties negotiated the ERL, which provided

Raven Hill remedies in the event negotiations were unsuccessful.  Having agreed to all

that, Raven Hill provides no basis for the Court to relieve it of its contractual

obligations.[13]

Therefore, the Defendants' motions for summary judgment on Counts III and IV

are **GRANTED**.

### III. CONCLUSION

For the foregoing reasons, BASF Corporation's motion for summary judgment (Doc.

100) is **GRANTED in part and DENIED in part**, and BASF SE's (Doc. 98), BASF

Catalysts' (Doc. 94), and Baird's (Doc. 96) motions for summary judgment are

**GRANTED**.

**SO ORDERED,** this 10th day of August, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[13] At oral argument, Raven Hill argued for the first time that it could avoid the disclaimers because it was fraudulently induced to sign the Confidentiality Agreement.  (Doc. 152 at 40:25-41:12, 42:24-44:5).  The only evidence Raven Hill cites, which it submitted for the first time at oral argument, is a September 24, 2011 email from Baird to Raven Hill.  (Docs. 151-1; 152 at 41:16-42:7).  This argument fails for several reasons.  First, Raven Hill waived it by raising it for the first time at oral argument.  *See, e.g.*, *Keys v. Dart Container Corp. of Ky.*, 2012 WL 2681461, at *6-7 (W.D. Ky.); *Young v. W. Publ'g Corp.*, 724 F. Supp. 2d 1268, 1280 n.5 (S.D. Fla. 2010).  Second, the email is nothing more than a cover letter for the Teaser and contains financial information found in the Teaser.  (Doc. 152 at 42:3-4).  As discussed above, the Teaser has disclaimers.  Finally, a party cannot claim that it was fraudulently induced to enter a contract based on statements or representations that directly conflict with the express terms of the contract.  *See Novare Grp.*, 290 Ga. at 189, 718 S.E.2d at 309.